In re Elizabeth P. WEBSTER, Debtor.

Elizabeth Webster, Plaintiff,

v.

Centex Home Equity Corp., Defendant.

Bankruptcy No. 01–18067–TS.
Adversary No. 01–1288–TS.

United States Bankruptcy Court,
W.D. Oklahoma.

Aug. 7, 2003.

Bonnie R. Platt, Oklahoma City, OK, for Plaintiff.

Robert T. Luttrell, III, Jim Timberlake, Oklahoma City, OK, for Defendant.

## ORDER REGARDING ADVERSARY COMPLAINT

NILES L. JACKSON, Bankruptcy Judge.

### INTRODUCTION

The players in this residential refinancing loan case are the borrower, the lender, a mortgage broker, and the loan closer. Interwoven among them are allegations of Truth in Lending Act violations.

The following evidence presented at trial questions whether the statutory requirements were violated:

1. The loan closer mistakenly inserted incorrect-as well as correct-loan disclosure documents into the borrower's loan packet. Can the "bona fide error" exception ride to the rescue?

2. The borrower acknowledged in writing that she received the required two copies of a notice of right to cancel, but only one such notice was found in the loan packet given to her at closing. Which player bears the burden of proof on this issue, and was it met?

3. The broker received two fees: one from the borrower, taken out of the loan proceeds, and another from the lender, taken from its own funds as a cost of doing business. Should those fees, which added together exceed a statutory threshold, be read in combination and thereby trigger additional required disclosures? Also, was the broker an agent of the lender, thereby rendering the lender liable for the broker's alleged acts of fraud and misrepresentation?

All the evidence pointing to statutory violations culminates in a dilemma for the Court regarding how to effectuate the remedy: should the statute be interpreted to require the rescinding borrower to perform her obligation to repay the loan proceeds as a condition of having the loan rescinded? In other words, should she be awarded a house free and clear of the lender's security interest without repaying any funds or only the right to rescind the loan after returning the funds borrowed?

### PROCEDURAL HISTORY

Plaintiff, Elizabeth Webster, filed this adversary proceeding alleging Defendant, Centex Home Equity Corporation (hereinafter "Centex") violated the Truth in Lending Act (hereinafter the "TILA") and the Oklahoma Consumer Protection Act (hereinafter the "OCPA"). On April 3, 2003, the Court conducted a trial on this issue. At the conclusion of the trial, the Court took the matter under advisement. The Court has considered the testimony of

the witnesses, has reviewed the exhibits and researched the applicable law, and renders the following Findings of Fact and Conclusions of Law as required by FED. R. BANKR. P. 7052.

### FINDINGS OF FACT

A. *Summary of Plaintiff's Testimony*

1. Plaintiff testified she wanted to refinance her home to pay off the existing mortgage, pay off credit card bills, and to then use the remaining loan proceeds to make some home improvements.

2. According to Plaintiff, she was introduced by a co-worker to Michael Floyd, an employee of World Mortgage. She did not understand Mr. Floyd was a mortgage broker, and thought she was obtaining a mortgage from World Mortgage. She told Mr. Floyd she wanted a fifteen-year mortgage with payments of no more than $350 per month.

3. Plaintiff met Mr. Floyd at the restaurant where she worked and signed a "bunch of papers" he gave her, without reading them. She testified nothing prevented her from reading the papers.

4. During the hearing Plaintiff stated: "It has been a long time since I met with Floyd and there are many things I have forgotten."

5. At the loan closing conducted July 14, 1998, Plaintiff signed "a bunch of papers" for loan closer Donna Cole without reading them, although nothing prevented her from reading them. Plaintiff does not remember Ms. Cole telling her she had the right to cancel the loan within three days, but she did acknowledge her signatures, one with her middle initial and one without it, on two separate copies of a document entitled "Notice of Right to Cancel."

6. Following closing, Ms. Cole gave Plaintiff a large white envelope. Plaintiff placed the envelope in a special drawer in her home and did not open it again until she met with her attorney.

7. Plaintiff made note payments to Centex, believing Centex was owned by World Mortgage.

8. Subsequently, when Plaintiff opened the white envelope in the presence of her attorney, the contents included the following documents stapled together:

(1) Certification of Instruments—signed by Donna Cole on July 14, 1998;

(1) Settlement Statement—unsigned and two pages in length;

(1) Mortgage—unsigned and seven pages in length;

(1) Note—unsigned and three pages in length;

(1) Truth–In–Lending Disclosure Statement—unsigned and two pages in length, with Page 2 preceding Page 1;

(1) First Payment Letter—unsigned;

(1) Waiver of Lender's Right to Escrow for Taxes and Insurance—unsigned;

(1) Borrowers' Agreement to Correct Errors and Omissions—unsigned;

(1) Property Appraisal Disclaimer—unsigned;

(1) Borrower's Certification & Authorization—unsigned;

(1) Notice of Right to Cancel—unsigned;

(1) Appraisal Disclosure—unsigned.

Plaintiff's Exh. A. Also in the white envelope, but separate from the stapled documents were the following:

(1) Settlement Statement—signed by Plaintiff and two pages in length; and

(1) Truth–In–Lending Disclosure Statement—signed by Plaintiff and dated July 14, 1998.

Plaintiff's Exh. B. Thus, when Plaintiff and her attorney went through the contents of the envelope, they found only one copy of the "Notice of Right to Cancel." The envelope also contained two Truth–in–Lending Disclosure Statements with different figures for the interest rate, the finance charge, and the amount financed, as well as two Settlement Statements reflecting different amounts for the broker's fee.

9. Plaintiff testified her attorney mailed a notice of rescission to Defendant on July 27, 2000. Plaintiff filed her Chapter 13 bankruptcy petition on August 6, 2001.

### B. *Summary of Testimony of Defendant's Witnesses*

#### 1. *Donna Cole*

a. She is an escrow officer for Oklahoma City Abstract and Title Company and conducted the July 14, 1998, closing of the loan transaction in which Plaintiff borrowed from Centex $29,500 secured by a mortgage on her home (hereinafter the "Webster Loan").

b. Prior to closing the Webster Loan, Ms. Cole received the Specific Closing Instructions from Centex (hereinafter the "Specific Closing Instructions"). Centex Exh. 19.

c. Also prior to closing, Ms. Cole received from Centex the Truth–in–Lending Disclosure Statement (for reasons explained subsequently in ¶ (B)(1)(d), this document will hereinafter be referred to as the "Incorrect Disclosure Statement"), and two copies of the Notice of Right to Cancel (hereinafter the "Notice of Right to Cancel"). Ms. Cole prepared the Uniform Settlement Statement (HUD–1) based upon figures provided to her by Centex (for reasons explained subsequently in ¶ (B)(1)(d), this document will hereinafter be referred to as the "Incorrect Settlement Statement"). As was her practice, prior to the closing of the Webster Loan she put unsigned copies of all the closing documents together and in an envelope for Plaintiff, in order to minimize delays after closing (hereinafter the "Unsigned Pre–Closing Copies"). Plaintiff's Exh. A.

d. Within hours before the closing, Ms. Cole received from Centex a facsimile transmission with updated figures, which necessitated preparation of a corrected Settlement Statement and a corrected Truth–in–Lending Disclosure Statement (hereinafter the "Corrected Settlement Statement" and the "Corrected Disclosure Statement"). Plaintiff's Exh. B. Ms. Cole made copies of the Corrected Settlement Statement and the Corrected Disclosure Statement and placed them in the envelope along with the Unsigned Pre–Closing Copies previously placed in the envelope.

e. Ms. Cole testified that at the closing she followed the Specific Closing Instructions. However, upon cross-examination she admitted that she signed the Certification of Instruments in which she "certifies that the instruments attached hereto are true and correct copies of instruments prepared for and executed by the necessary participants in the escrow closing completed by The Oklahoma City Abstract & Title Co." *prior to* the closing and *prior to* the time any documents were executed by Plaintiff. Furthermore, she stated that the lender sends two Notices of Right to Cancel, so she has the borrower sign both Notices even though the Specific Closing Instructions require the borrower to sign only one, and in this case the two Notices contained different signatures despite the instructions that "[a]ll loan documents must be signed exactly as the documents are typed."

f. After concluding the closing, pursuant to the Specific Closing Instructions, Ms. Cole returned to Centex the documents evidencing the closing of the Web-

ster Loan. She did not include either the Incorrect Settlement Statement or the Incorrect Disclosure Statement in the closing package she sent to Centex after the closing.

g. Three days after the closing of the Webster Loan, at which time the rescission period expired, Ms. Cole caused the disbursement of the loan proceeds. Among the disbursements was a check payable to World Mortgage in the amount of $2,035.50. According to Ms. Cole, $1,445.50 of this amount was paid by Plaintiff and was derived from the loan proceeds. *See* Plaintiff's Exh. B, p. 2 at line 808. The other $590 of the broker's fee paid to World Mortgage was paid by Centex outside the closing and was not deducted from the proceeds of the loan. *See* Plaintiff's Exh. B, p. 2 at line 811.

h. After this litigation commenced, Ms. Cole discovered she had made copies of the closing documents relating to the Webster Loan to give to Plaintiff before she received the final figures from Centex, and that she had inadvertently forgotten to remove the copies of the Incorrect Disclosure Statement and the Incorrect Settlement Statement from Plaintiff's earlier-prepared envelope.

i. According to Ms. Cole, Plaintiff saw and signed only the Corrected Settlement Statement and Corrected Disclosure Statement at the closing; Plaintiff never saw the Incorrect Settlement Statement or Incorrect Disclosure Statement during the closing.

2. *Gregory Harnisch*

a. He is Vice President of Compliance of Centex and personally reviewed its file of the Webster Loan.

b. World Mortgage provided Plaintiff's loan application to Centex.

c. World Mortgage is only one of many loan brokers who bring mortgage loan applications to Centex.

d. Mr. Harnisch represented that the calculations reflected on the Corrected Disclosure Statement signed by Plaintiff are correct.

e. Mr. Harnisch represented that the Corrected Settlement Statement (HUD–1), is an accurate statement of all loan amounts distributed directly to Plaintiff, amounts paid to other persons on Plaintiff's behalf, amounts credited to fees and expenses with Centex, and amounts which were prepaid finance charges.

f. According to Mr. Harnisch's calculations, the total points and fees paid by Plaintiff constituted 7.25% of the total loan amount. Details are set out on page three of his proffered testimony. These calculations are based upon a broker fee in the amount of $1,445.50.

g. By way of the Specific Closing Instructions, Centex required Ms. Cole to provide Plaintiff with two copies of a Notice of Right to Cancel the loan transaction.

h. The closing package received by Centex from Ms. Cole after the closing of the Webster Loan contained two different Notices of Right to Cancel signed by Plaintiff. Defendant's Exhs. 10 & 11. One Notice was signed "Elizabeth P. Webster" and dated. Defendant's Exh. 10. The other Notice was signed "Elizabeth Webster" and was not dated. Defendant's Exh. 11. Each Notice contains an acknowledgment by Plaintiff of "receipt of two copies of NOTICE of *RIGHT TO CANCEL* . . . ."

i. Additionally, Centex required Ms. Cole to give Plaintiff at closing the Corrected Disclosure Statement and the Corrected Settlement Statement. The closing package received by Centex from Ms. Cole

after closing contained the Corrected documents mentioned above. Neither the Incorrect Disclosure Statement nor the Incorrect Settlement Statement were among the documents Ms. Cole returned to Centex.[1]

j. Upon review of the closing package, Centex found no indication that Plaintiff did not receive every document she was required to receive, nor that she had received duplicate but inconsistent and incorrect documents.

k. Centex paid Michael Floyd a broker fee in the amount of $590, outside the closing. This fee was absorbed by Centex as a cost of doing business.

### C. *Summary of the Pertinent Documents*

1. As set forth previously, there were two different Settlement Statements and two different Truth–In–Lending Disclosure Statements: the first (or earlier) documents are referred to as the Incorrect Settlement Statement and the Incorrect Disclosure Statement. The second (or later) documents are referred to as the Corrected Settlement Statement and the Corrected Disclosure Statement. All were prepared by Ms. Cole based on information furnished by Centex. Ms. Cole prepared the Incorrect Settlement Statement and Incorrect Disclosure Statement first, and copies of these incorrect documents were included in the stapled packet of Unsigned Pre–Closing Copies placed in the white envelope prior to the closing of the Webster Loan. Ms. Cole prepared the Corrected Settlement Statement and Corrected Disclosure a few hours before the closing, based upon new financial closing information received from Centex. Ac-

cording to Ms. Cole, she inadvertently failed to remove the Incorrect Settlement Statement and the Incorrect Disclosure Statement from Plaintiff's envelope when she inserted the Corrected Settlement Statement and Corrected Disclosure Statement. She testified that only the Corrected Settlement Statement and Corrected Disclosure Statement were seen and signed by Plaintiff at closing.

2. Only the Corrected Settlement Statement and Corrected Disclosure Statement bear Plaintiff's signature. Plaintiff's Exh. B.

3. The Corrected Settlement Statement is signed by Plaintiff on all pages.[2] Plaintiff's Exh. B & Defendant's Exh. 9. Among the fees listed on the corrected Settlement Statement are two broker fees. One is referenced on line 808 as part of the closing fees: "Broker Fee to World Mortgage $1,445.50," and the other is referenced on line 811 as paid outside the closing: "Fee Pd By CHEC POC For Broker Services Rendered $590.00 payable to World Mtg." According to line 202, the principal amount of the loan was $29,500.

4. The Incorrect Settlement Statement originally placed in Plaintiff's envelope is not signed or dated by Plaintiff. Plaintiff's Exh. A. While the loan amount on line 202 is the same, it is inconsistent with the Corrected Settlement Statement in that line 808 of the Incorrect Settlement Statement references as part of the closing fees a "Broker Fee to World Mortgage $590," and line 811 contains the typewritten words "Fee Pd By CHEC POC For Broke" but no dollar amount.

---

1. The Specific Closing Instructions state that: "[i]t is extremely important that the closed loan package as well as corrected or missing documents ... be promptly returned to the Lender specified above."

2. Plaintiff's Exhibit B contains a two-page version of the Corrected Settlement Statement, while Defendant's Exhibit 9 contains a three-page version.

5. The Corrected Disclosure Statement bears Plaintiff's signature and is dated July 14, 1998. Plaintiff's Exh. B. The Amount Financed is stated to be $27,504.50 at a stated interest rate of 10.990%, the Annual Percentage Rate is 11.895%, the Finance Charge is $73,533.42, and the Total of Payments is $101,037.92. Plaintiff's Exh. B.

6. The Incorrect Disclosure Statement originally placed in Plaintiff's envelope bears no signature or date. Plaintiff's Exh. A. The Amount Financed is stated to be $28,360.00 at a stated interest rate of 10.990%, the Annual Percentage Rate is 11.493%, the Finance Charge is $72,677.92, and the Total of Payments is $101,037.92. Plaintiff's Exh. A.

7. The Note reflects Plaintiff's initials on pages one and two and her signature on page three. Defendant's Exh. 3. It evidences a loan in the amount of $29,500.00 at 10.990% interest with maturity date of July 20, 2028. Defendant's Exh. 3.

8. The Mortgage bears Plaintiff's initials on pages one through six and her signature on page seven. Defendant's Exh. 4. According to the Mortgage, Plaintiff borrowed $29,500.00 from Centex with repayment of such obligation secured by a mortgage on her principal residence. Defendant's Exh. 4.

9. The "Mortgage Loan Disclosure Estimated Statement Only" is signed by Plaintiff. Plaintiff's Exh. J. It states the loan amount will be $29,500 at 10.99% interest with a term of 240 months and payments of $304.29. Plaintiff's Exh. J. It also contemplates a "Loan Origination Fee" in the amount of $1,445.50. Plaintiff's Exh. J.

10. The "Mortgage Broker Fee Agreement and Disclosure" bears Plaintiff's signature and what appears to be the signature of Michael Floyd. Plaintiff's Exh. K.

It provides that a fee equal to 4.9% of the loan amount of $29,500, or $1,445.50, is due and payable to World Mortgage as compensation for services rendered to Plaintiff in obtaining the loan for her. Plaintiff's Exh. K. In signing this agreement, Plaintiff authorized "the payment of this mortgage broker fee directly to [World Mortgage] by [Centex] from the proceeds of the mortgage loan." Plaintiff's Exh. K. The agreement further provides that "we will try to obtain a (type) conv. loan for you ... [w]e will not be the lender," and "[w]e will be working as an independent financial service provider, and not as an agent, with no duty of loyalty or fiduciary duty to you or the lender." Plaintiff's Exh. K.

11. The Uniform Residential Loan Application is signed by Plaintiff and shows she is applying for a loan in the amount of $29,500, at an interest rate of 10.99%, for a term of 240 months. Defendant's Exh. 1.

12. One copy of the Notice of Right to Cancel bears Plaintiff's signature with the inclusion of her middle initial "P". Defendant's Exh. 10. This copy was included in the closing package received by Centex from Ms. Cole after the closing.

13. A second copy of the Notice of Right to Cancel bears Plaintiff's signature but does not include her middle initial. Defendant's Exh. 11. Plaintiff testified she signs her name both with and without the middle initial. This copy was also included in the closing package received by Centex from Ms. Cole after the closing.

14. A third copy of the Notice of Right to Cancel contains no signature. Plaintiff's Exh. A. This copy was in the white envelope sent home with Plaintiff after the closing.

D. *Evidence Supporting and Refuting Plaintiff's Receipt of Documents*

1. Notice of Right to Cancel:

A. Evidence supporting receipt of only one copy by Plaintiff:

1. Plaintiff's testimony that when she opened the envelope of closing documents in her attorney's office, only one copy was found.

2. Plaintiff's Exhibits A and B which Plaintiff testified contain all the documents that were inside the white envelope she received from Ms. Cole at the conclusion of the closing of her loan. Plaintiff's Exhibit A includes only one copy of the Notice of Right to Cancel and that copy is unsigned. Plaintiff's Exhibit B does not include a Notice of Right to Cancel.

B. Evidence supporting receipt of two copies by Plaintiff:

1. Centex received from the loan closer two copies of this document. One was signed and dated by Plaintiff; the other was signed with a different signature and not dated.

2. Plaintiff, by signing the two copies referenced in the preceding subparagraph, acknowledged receiving two copies at closing.

3. Centex instructed Ms. Cole to give Plaintiff two copies.

4. Ms. Cole's testimony that it is her practice to follow the lender's instructions to give two copies.

2. Settlement Statements and Truth–in–Lending Disclosure Statements:

A. Evidence supporting Plaintiff receiving/using/seeing the Incorrect Settlement Statement and Incorrect Disclosure Statement at closing:

1. Plaintiff's testimony that when she opened the envelope of closing documents at her attorney's office, copies of the Incorrect Settlement Statement and Incorrect Disclosure Statement were included in the sta-pled packet. Neither of these documents bore Plaintiff's signature.

2. Ms. Cole's testimony that it is her practice to place copies of all loan closing documents in an envelope before the actual closing.

B. Evidence supporting Plaintiff receiving/using/seeing the Corrected Settlement Statement and Corrected Disclosure Statement at closing:

1. Only the Corrected Settlement Statement and the Corrected Disclosure Statement were signed by Plaintiff; the Incorrect Settlement Statement and the Incorrect Disclosure Statement are both unsigned.

2. Centex received from the Ms. Cole the Corrected Settlement Statement, signed by Plaintiff, and the Corrected Disclosure Statement, signed and dated by Plaintiff.

3. Centex did not receive a copy of either the Incorrect Settlement Statement or the Incorrect Disclosure Statement.

4. Plaintiff did not read the documents at closing, although she admitted neither anything nor anyone prohibited her from reading them.

5. Ms. Cole's testimony that she neglected to remove the copies of the Incorrect Settlement Statement and the Incorrect Disclosure Statement from Plaintiff's envelope after they had been superseded by the Corrected Settlement Statement and the Corrected Disclosure Statement.

6. Ms. Cole's testimony that only the Corrected Settlement Statement and the Corrected Disclosure Statement were signed or seen at the closing of the Webster Loan.

## APPLICABLE LAW AND CONCLUSIONS OF LAW

### A. *Regarding Plaintiff's Truth in Lending Act Claims:*

■ 1. The TILA is applicable to consumer credit transactions "in which a security interest is or will be acquired in real property ... used or expected to be used as the principal dwelling of the consumer, in which the total amount financed exceeds $25,000." 15 U.S.C. § 1603(3). Because Plaintiff granted to Centex a mortgage on her principal dwelling to secure a loan in the amount of $29,500, the loan transaction between Plaintiff and Centex constituted a consumer credit transaction governed by the TILA and Regulation Z.

2. Certain types of transactions are exempted from the application of the TILA under 15 U.S.C. § 1635(e). The loan transaction between Plaintiff and Centex is not one of the types of transactions exempted thereunder.

3. In this case, Mr. Harnisch asserts that any error by Centex should be deemed a bona fide error within the meaning of 15 U.S.C. § 1640(c), therefore relieving Centex of any liability for such errors. He testified that Centex's Specific Closing Instructions required Ms. Cole to comply with the provisions of TILA, that Centex reviewed the documents returned to it by Ms. Cole after the closing of the Webster Loan and based upon those documents determined that Ms. Cole had complied with the requirements of the Specific Closing Instructions, and that there was nothing in the loan closing package from which Centex could have discovered that Plaintiff received inconsistent documents and that Plaintiff did not receive every document she should have received.

■ The subsection upon which Centex relies provides that:

[a] creditor ... may not be held liable ... for a violation of this subchapter if the creditor ... shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

15 U.S.C. § 1640(c). An example of a bona fide error is a clerical error. *Id.* Interpreting that subsection, the Seventh Circuit Court of Appeals has explained that:

Congress required more than just the maintenance of procedures which were designed to provide proper disclosure[s] .... Rather, it required procedures designed to avoid and prevent the errors which might slip through procedures aimed at good faith compliance. This means that the procedures which Congress had in mind were to contain an extra preventative step, a safety catch or a rechecking mechanism. Congress left the exact nature of the preventative mechanism undefined. It is clear, however, that Congress required more than just a showing that a well-trained and careful clerk made a mistake. On the other hand, a showing that the first well-trained clerk's [action] was checked by a second well-trained clerk or that one clerk [employed a procedure to double check his or her own action] would satisfy Congress' requirements.

*Davison v. Bank One Home Loan Services,* 2003 WL 124542 at *7 (D.Kan. Jan.13, 2003) (citing *Mirabal v. General Motors Acceptance Corp.,* 537 F.2d 871, 878–79 (7th Cir.1976), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 699 (1978), *overruled on other grounds Brown v. Marquette Savs. and Loan Ass'n,* 686 F.2d 608 (7th Cir.1982)); *see also Gallegos v. Stokes,* 593 F.2d 372, 376 (10th Cir. 1979).

■ Ms. Cole testified that she followed the Specific Closing Instructions. However, she admitted on cross-examination that she signed the Certification of Instruments before the closing and before Plaintiff had executed the documents, and that the lender sends two Notices of Right to Cancel so she has the borrower sign both Notices even though the Specific Closing Instructions require the borrower to sign only one. Further, she allowed Plaintiff to sign documents with differing signatures even though the Specific Closing Instructions require that "[a]ll loan documents must be signed exactly as the documents are typed." Ms. Cole also conceded that she inadvertently failed to remove the Incorrect Settlement Statement and the Incorrect Disclosure Statement from the envelope she gave to Plaintiff at the conclusion of the closing. There was no testimony or evidence that Oklahoma City Abstract and Title Company or Ms. Cole utilized any "extra preventative step ... safety catch or a rechecking mechanism" to detect any errors in compliance with the Specific Closing Instructions.

Based upon the foregoing, the Court concludes that the errors that occurred during the closing were not bona fide errors, and that Centex is liable for such errors.

■ 4. Under the TILA and Regulation Z, prior to extending credit to Plaintiff, Centex was required to disclose to Plaintiff "certain material terms clearly and conspicuously in writing, in a form that [Plaintiff] may examine and retain for reference." *Ralls v. Bank of New York (In re Ralls)*, 230 B.R. 508, 515 (Bankr. E.D.Pa.1999) (citing 15 U.S.C. §§ 1638(b)(1) & 12 C.F.R. § 226.17(a)(1)) (other citations omitted); *see also* 15 U.S.C. § 1632(a). " '[T]he TILA and Reg. Z ... guarantee ... meaningful disclosure of credit terms by requiring the creditor to give the borrower a Disclosure Statement specifying the credit terms in clear and straightforward language.' " *Ralls,* 230 B.R. at 515 (citing *Nichols v. Mid–Penn Consumer Discount Co.,* 1989 WL 46682 at *3 (E.D.Pa. Apr.28, 1989)). Those required disclosures are: the amount financed, the amount of the finance charge, the annual percentage rate, the total of payments, the number, amount, and due dates or period of payments scheduled to repay the total of payments. 15 U.S.C. § 1638(a). Such disclosures must be made before credit is extended, thus before the transaction is consummated, and must reflect the actual terms of the legal obligation between the parties. 15 U.S.C. § 1638(b)(1); 12 C.F.R. § 226.17(b) & (c)(1).

■ Plaintiff argues that the fact her envelope contained both the Incorrect Disclosure Statement and the Correct Disclosure Statement constituted delivery of inconsistent material disclosures in violation of 15 U.S.C. §§ 1632(a) & 1638, and 12 C.F.R. § 227.17.

Even though Plaintiff's envelope contained copies of both the Incorrect Disclosure Statement and the Corrected Disclosure Statement, the Court is convinced that during the closing Plaintiff saw and signed only the Corrected Disclosure Statement, which contained accurate information and complied with the requirements of the TILA. It was undisputed that the Incorrect Disclosure Statement was simply an earlier draft of the Corrected Disclosure Statement, and Centex complied with the requirements of 12 C.F.R. § 226.17(f) by redisclosing prior to consummation of the Webster Loan transaction. Accordingly, it is the Court's opinion that Centex did not give Plaintiff inconsistent disclosure statements, and did not violate the applicable provision of the TILA, thus Plaintiff's cause of action

based upon conflicting disclosure statements must fail.

■ 5. In a loan transaction in which the borrower uses his principal dwelling to secure the loan from the creditor, the TILA provides the borrower with a right to rescind the transaction. 15 U.S.C. § 1635(a). Plaintiff used her principal dwelling to secure the loan from Centex, thus the TILA provided her with a right to rescind the transaction.

■ 6. "In a transaction subject to rescission, a creditor shall deliver [to each borrower] two copies of the notice of the right to rescind ...." 12 C.F.R. § 226.23(b)(1). A borrower's written acknowledgment that he or she received two copies of the notice of the right to rescind "does no more than create a rebuttable presumption of delivery thereof." 15 U.S.C. § 1635(c). The Court accepts as true Plaintiff's testimony, supported by Plaintiff's Exhibits A and B, that when she opened the envelope of closing documents in her attorney's office, it contained only one copy of the Notice of Right to Cancel was found. Therefore, Centex failed to comply with 12 C.F.R. § 226.23(b)(1), and Plaintiff was entitled to rescind the transaction upon this basis.

■ 7. Included among the information that must be disclosed clearly and conspicuously on the Notice of Right to Cancel is "the date the rescission period expires." 12 C.F.R. § 226.23(b)(1)(v). Pursuant to the TILA, the consumer has a right "to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material

disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so." 15 U.S.C. § 1635(a); 12 C.F.R. § 226.23(a)(3). Thus, if Centex had complied with its statutory disclosure obligations, Plaintiff would have had three business days after consummation of the Webster Loan within which to rescind the transaction. This information was properly disclosed on the Notice of Right to Cancel. However, since Centex failed to provide Plaintiff with two copies of the Notice of the Right to Rescind and thus failed to comply with its statutory disclosure obligations, the time within which Plaintiff could rescind the transaction expired three years from the date of consummation of the transaction, which date was July 16,2001.[3] 15 U.S.C. § 1635(f); 12 C.F.R. 226.23(a)(3). Plaintiff timely rescinded the transaction by a letter written by her attorney on July 27, 2000.

**B. *Regarding Plaintiff's Home Ownership Equity Protection Act (HOEPA) Claims:***

■ 1. Certain mortgages are subject not only to the TILA disclosures, but also to additional disclosures. 15 U.S.C. § 1639(a)(1); 12 C.F.R. § 226.31(a).

■ 2. A mortgage subject to such additional disclosures is one resulting from a "consumer credit transaction that is secured by the consumer's principal dwelling" for a purpose *other than* to finance the acquisition or initial construction of such dwelling, *and* where either the annual percentage rate exceeds a certain benchmark rate, or "the total points and fees payable by the consumer at or before clos-

---

**3.** Three years from July 14, 1998, was July 14, 2001, which fell on a Saturday. Plaintiff's right to rescind expired on the next business day thereafter which was Monday, July 16, 2001.

ing will exceed the greater of—(i) 8 percent of the total loan amount; or (ii) $400." 15 U.S.C. § 1602(aa)(1)(B) (emphasis added by the Court); 12 C.F.R. § 226.32(a)(1)(ii). In calculating points and fees for purposes of paragraph (1)(B), "[a]ll compensation paid to mortgage brokers" is to be included. 15 U.S.C. § 1602(aa)(4)(B); 12 C.F.R. § 226.32(b)(1)(ii). The Court finds that Plaintiff's loan from Centex was secured by her principal dwelling, and that the loan was for a purpose other than to finance the acquisition or initial construction of her home. The Court further concludes that the $590 broker's fee paid by Centex to World Mortgage falls within the all-encompassing statutory definition of "points and fees." 15 U.S.C. § 1602(aa)(4)(B) ("points and fees shall include...*all* compensation paid to mortgage brokers") (emphasis added by the Court). The parties admit the addition of this $590 fee to the other fees charged Plaintiff would mean plaintiff was charged in excess of the 8% figure reflected in § 1602(aa)(1)(B)(i), thus the Webster Loan involved a mortgage subject to the additional disclosures required by 15 U.S.C. § 1639(a).

3. The additional disclosures applicable to such a mortgage are set forth in 15 U.S.C. § 1639(a), and are to be given "not less than 3 business days prior to consummation of the transaction."[4] 15 U.S.C. § 1639(b)(1); 12 C.F.R. § 226.32(c)(1). These are considered "material disclosures" within the meaning of 15 U.S.C. § 1602(u). 12 C.F.R. § 226.23(a)(3) at n. 48 ("The term 'material disclosures' means ... the disclosures and limitations re-

ferred to in § 226.32(c) and (d)"). Centex concedes these disclosures were not given.

4. Failure to comply with this section constitutes a "failure to deliver the material disclosures ... for the purpose of section 1635." 15 U.S.C. § 1639(j). Thus, Plaintiff has an additional ground for rescission based upon Centex's failure to comply with 15 U.S.C. § 1639.

C. *Regarding the Effect of Rescission:*

■■■■ 1. Based upon the foregoing, Plaintiff had two valid grounds for rescission of the transaction with Centex, and timely rescinded the transaction. Upon rescission the consumer is not liable for any finance or other charge, and any security interest given by the consumer becomes void upon rescission. 15 U.S.C. § 1635(b). Once the creditor receives a notice of rescission, it has twenty days thereafter in which to return any money or property given to it by the consumer and to take the necessary or appropriate action to terminate any security interest created under the transaction. *Id.* Upon the performance by the creditor of its obligations under this section, the consumer shall tender back to the creditor the property the consumer received from the creditor under the transaction. *Id.*

■■■ In this case, when Centex received Plaintiff's notice of rescission, rather than immediately complying with the obligations set forth in the statute, Centex filed a Complaint in the United States District Court for the Western District of Oklahoma tendering a release of mortgage, asking that court to determine if the rescission was proper, and if so, asking the court to modify the procedures set forth in

---

4. These specific disclosures are:

(A) "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application" and

(B) "If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan."

15 U.S.C. § 1639(a)(1)(A) & (B).

15 U.S.C. § 1635(b) to condition release of the mortgage by Centex upon Plaintiff's tender to Centex of the monies she received pursuant to the loan transaction. Plaintiff asserts that Centex should be liable for statutory damages for failing to comply with the statute's requirement to immediately return Plaintiff's money to her and release the mortgage on her home. It is the Court's opinion, though, that Centex's action in seeking a declaratory judgment was justified. In a typical case in which the consumer rescinds within three days, there is no question that the consumer has such a right. However, in a case in which the consumer rescinds several years after consummation of the transaction, there are bound to be questions, as here, regarding whether the consumer is legally entitled to effect such rescission and a court is in the best position to make such determination. Usually such a proceeding would be summary in nature and the issues would be resolved quickly. This case, in which litigation now spans over three years, proves the Court's point that entitlement to rescission can involve complex questions. Based upon the foregoing, the Court finds that Centex did not violate the TILA by tendering a release of mortgage and seeking a declaratory judgment from the district court.

 Plaintiff subsequently filed for bankruptcy and the district court proceeding was eventually dismissed. Thus, it is now incumbent upon this Court to determine whether Centex's release of the mortgage on Plaintiff's home can be conditioned upon Plaintiff's tender to Centex of the monies she received pursuant to the loan transaction. The Court has reviewed the authorities relied upon by the parties and has done additional research, and is of the opinion that the approach set forth in *Quenzer v. Advanta Mortgage Corp. USA,* 288 B.R. 884 (D.Kan.2003) best reflects this Court's view relating to the manner in which 15 U.S.C. § 1635(b) should be enforced.

In *Quenzer,* the court noted that the Tenth Circuit Court of Appeals "has previously held that courts can alter TILA's statutory scheme because rescission is an equitable remedy." *Quenzer,* 288 B.R. at 887 (citing *Rachbach v. Cogswell,* 547 F.2d 502, 505 (10th Cir.1976)). Based upon the analysis in *Rachbach,* the *Quenzer* court concluded that "although a debtor's tender back is not mandated as a prerequisite to rescission, it may be an appropriate condition attached thereto under certain circumstances because of the equitable nature [of] that statutory remedy." 288 B.R. at 888. The remedy of rescission "does not mean an annulment that is definitively accomplished by unilateral pronouncement, but rather a remedy that restores the *status quo ante.*" *Quenzer,* 288 B.R. at 888 (citing *Ray v. Citifinancial, Inc.,* 228 F.Supp.2d 664 (D.Md.2002)). The legislative history of the TILA confirms this by clarifying that "the courts, at any time during the rescission process, may impose equitable conditions to insure that the consumer meets his obligations after the creditor has performed his obligations as required by the act." *Quenzer,* 288 B.R. at 888 (citing S.Rep. No. 368, 96th Congress., 2d Sess. 29 (1980), reprinted in 1980 U.S.C.C.A.N. 236, 265). In reaching its result, the *Quenzer* court considered the post-*Rachbach* statutory revisions to TILA and Regulation Z and the current language of Regulation Z. 288 B.R. at 888–89. This Court agrees with and adopts the reasoning in *Quenzer.* This Court further concurs with its holding that:

> conditioning the avoidance of [the creditor's] mortgage on the return of its money by the [debtor] gives effect to the plain language of § 1635 without offending the policy underlying the rescission doctrine. This court cannot accept the

proposition that strict enforcement of TILA justifies rendering a debt in the amount at issue here unpaid and completely unsecured, given the passage of time and other circumstances present. Even though the defendant violated TILA, automatically relegating its entire claim to unsecured status under these circumstances would be completely inequitable and would exact a penalty entirely disproportionate to its offense.

*Quenzer,* 288 B.R. at 889. In accordance with the holding in *Quenzer,* this Court will impose conditions relating to the voiding of Centex's security interest upon terms that will be equitable and just to the parties in view of all the surrounding circumstances, and will require Plaintiff to return to Centex the property received in connection with the transaction as a condition of rescission. 288 B.R. at 889.

 2. The TILA entitles borrowers not only to rescission, but also to statutory damages under 15 U.S.C. § 1640. Pursuant to § 1635(g), "in addition to rescission, the court may award relief under section 1640 ... for violations of this subchapter not relating to the right to rescind." That section covers civil liability and statutory damages for violations of TILA, and provides that any creditor who fails to comply with any requirement imposed under the TILA is subject to civil penalties. 15 U.S.C. § 1640(a). That civil penalty amount shall be equal to the sum of–

(1) any actual damage sustained by such person as a result of the failure;

(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, ... or (iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2,000;

. . . .

(3) in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court; and

(4) in the case of a failure to comply with any requirement under section 1639 of this title, an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material.

15 U.S.C. 1640(a)(1), (a)(2)(A), (a)(3) & (a)(4). "Any action under this section may be brought ... within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). Centex argues that Plaintiff's claim for statutory damages is barred by this statute of limitations. In this case, the violation occurred July 14, 1998, and Plaintiff brought her action on October 4, 2001, well beyond the one year statute of limitations. Thus, Plaintiff is not entitled to civil penalties under 15 U.S.C. § 1640.

Plaintiff alternatively argues her claim for statutory damages should be allowed either under the Oklahoma Consumer Protection Act or the doctrine of equitable tolling. The Court has reviewed the record in light of the authorities cited, and finds the evidence is insufficient to sustain such cause of action under either alternative basis proposed by Plaintiff.

D. *Regarding Plaintiff's Agency Claim:*

 1. Plaintiff asserts that Michael Floyd and World Mortgage were agents of Centex. An agency relationship has three essential characteristics: (1) the power of the agent to alter the legal relationships between the principal and third

parties and the principal and himself; (2) the existence of a fiduciary relationship toward the principal with respect to matters within the scope of agency; and (3) the right of the principal to control the agent's conduct with respect to matters within the scope of the agency. *Sabel v. Mead Johnson & Co.*, 737 F.Supp. 135, 138 (D.Mass.1990); RESTATEMENT (SECOND) OF AGENCY §§ 12–14. The issue of control is the most important in determining whether an agency relationship exists. *Sabel*, 737 F.Supp. at 138. The agency issue is usually a question of fact. *Overseas Private Investment Corp. v. Metropolitan Dade Cty.*, 826 F.Supp. 1564, 1576 (S.D.Fla.1993). The record in this case is insufficient to support a finding that Michael Floyd or World Mortgage were agents of Centex.

### E. Regarding Plaintiff's Demand for Attorney Fees:

1. The TILA provides that "in any action in which a person is determined to have a right of rescission under section 1635 ... the costs of the action, together with a reasonable attorney's fee" may be assessed against the liable entity. 15 U.S.C. § 1640(a)(3). Thus, Plaintiff is entitled to recover the costs of this action, along with a reasonable attorney fee.

### DECISION

Plaintiff filed her complaint alleging violations of the TILA and asking the Court to allow her to keep her house free and clear of the lien of Centex with no mention of complying with the duties imposed upon her by the TILA; in effect asking for a free house. Plaintiff has shown no authority, and the Court can find none, to support Plaintiff's "Free House" theory. The relief to which Plaintiff is entitled is as set forth above and summarized in this paragraph. Plaintiff is entitled to rescind the Webster Loan transaction. As a consequence of such rescission, Plaintiff is not liable to Centex for any finance or other charge. Further, Centex is to return to Plaintiff any money or property given to it by Plaintiff as earnest money, down payment, or otherwise, and is to take the appropriate action to reflect the termination of Centex's security interest in Plaintiff's home, conditioned upon Plaintiff's tender to Centex of the property delivered to her by Centex under the Webster Loan transaction. The parties are to comply with these directives within sixty days from the date of this Order. Should the parties be unable to determine the monetary amounts to be exchanged, an appropriate pleading submitting the dispute to the Court may be filed. Finally, counsel for Plaintiff is granted sixty days from the date of this Order in which to file her motion for attorney fees and costs and, unless agreement is reached, the Court will set such motion for hearing.